UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

BRIGID BAILEY, et al.,              No. 2:07-cv-02154-MCE-DAD

    Plaintiffs,

    v.                              <u>ORDER</u>

UNITED STATES OF AMERICA,

    Defendant.

----oo0oo----

    The survivors of Joseph Bailey initiated this action
alleging that the United States' failure to properly warn
Mr. Bailey of the existence of a submerged dam in the Yuba River
directly resulted in his death.  Presently before the Court is
the United States' Motion for Summary Judgment, or, in the
alternative, Motion to Dismiss for Lack of Jurisdiction.
According to Defendant, though the Government has partially
waived its sovereign immunity under the Federal Tort Claims Act
("FTCA"), that waiver is inapplicable here.  For the following
reasons, Defendant's Motion is granted and this action is
dismissed.

1

## BACKGROUND

The relevant facts are undisputed.  On May 29, 2005, Mr. Bailey took his two sons rafting down the Yuba River near Marysville, California.  During that trip, the Baileys floated over a submerged dam at Daguerre Point.  When the family unknowingly went over the dam, the two boys were rescued by bystanders, but Mr. Bailey was sucked under the dam's spill water and drowned.

In April 2005, approximately one month prior to the accident, the United States Army Corps of Engineers ("Army Corps") placed a warning sign 1,500 feet upstream from the submerged dam.  Additional signs posted between that warning and the dam stated, *inter alia*, "Danger-Submerged Dam Ahead Take Out Now," "Raft Portage," and "Danger-Submerged Dam Ahead-Take Out This Side."  The Army Corps also installed a buoy equipped with a sign further warning individuals to "Take Out."  Because of the size and weight of these signs, their installation required the labor of two to three individuals.  Additionally, installation could necessitate that employees "drive through a portion of the river to place the signs on the sand/gravel bar."

Heavy water flows on the Yuba River subsequently resulted in the loss of those recently installed signs, and, by May 19, 2005, Army Corps employees had actual knowledge that the signs were missing.  Thus, on May 25, Army Corps personnel attempted to assess the situation near Daguerre Point, but were unable to reach the signs due to the then-existing dangerous water conditions.

The Army Corps finally replaced the missing signs on May 30, the day after Mr. Bailey's death.

Relevant to the determination of when and where these signs were placed was the Army Corps' previously promulgated Sign Standards Manual ("SSM"), which explained the responsibilities and obligations of the Government with respect to sign maintenance.  The SSM was a self-proclaimed "guide to good sign maintenance practices" and stated that "[t]he establishment of simple management procedures as described in this section, will help insure that broken damaged or missing signs are identified, repaired or replaced in a timely manner and that preventative maintenance is performed on a regular basis."  Supplemental Declaration of Lynn Trinka Ernce ("Supp. Ernce Decl."), Exh. H, C.1.  An included worksheet intended to be utilized by maintenance personnel also stated, "It is imperative that damaged signs be reported as soon as the problem is noticed so that the necessary maintenance work can be scheduled and completed in a timely manner."  Declaration of Gregory D. Rueb, Exh. A, C.3.  Finally, the SSM further advised, "It is also critical that missing or damaged signs be replaced or repaired in a timely manner."  Id., C.1.[1]

///

///

_____

[1] While the Court is aware that Defendant objects to the Court's reliance on Plaintiffs' version of the SSM, which is the source of this sentence, because there is no way for the Court to determine from the face of the submitted evidence which version was indeed in effect in 2005 and because the Court's reliance on Plaintiffs' evidence does not alter the Court's resolution of the instant Motion, Defendant's objection is overruled.

Nonetheless, the drafters also acknowledged, "The actual plan for sign placement will be developed for each project site on a site by site basis," and "[i]t is impossible for these guidelines to anticipate all conditions...[T]o effectively sign many locations will be a difficult design and engineering challenge that may require considerable field work and the assistance of District and Division specialists before the most effective approach is developed and refined." Declaration of Jonathan Friedman, Exh. B, 14.45. The SSM also advised that "[p]ersonnel safety is a prime concern in performing sign maintenance. Crew supervisors and members must be familiar with standard health and safety procedures to insure that field tasks are accomplished safely and efficiently." Supp. Ernce Decl., Exh. H, C.3.

In light of the above facts, Plaintiffs contend that the Army Corps was aware that critical warning signs were missing from the Yuba River at the time of Mr. Bailey's death and that, nevertheless, the Government negligently failed to replace those signs prior to the busy Memorial Day weekend. Accordingly, it is Plaintiffs' position that the United States is liable for negligence, negligent infliction of emotional distress, and wrongful death. However, the Government asserts that its decision as to when to replace the signs was protected by the discretionary function exception to its general waiver of immunity under the FTCA. This Court agrees with Defendant and now dismisses for a lack of subject matter jurisdiction.

///

///

**STANDARD**

2

3      "When a court determines that the United States is immune

4  from suit under the FTCA, the proper disposition is a dismissal

5  for lack of subject matter jurisdiction." <u>LeCrone v. U.S. Navy</u>,

6  958 F. Supp. 469, 472 n.1 (S.D. Cal. 1997).  In moving to dismiss

7  for lack of subject matter jurisdiction pursuant to Rule

8  12(b)(1), the challenging party may either make a "facial attack"

9  on the allegations of jurisdiction contained in the complaint or

10 can instead take issue with subject matter jurisdiction on a

11 factual basis ("factual attack").  <u>Thornhill Publishing Co. v.</u>

12 <u>General Tel. & Elect. Corp.</u>, 594 F.2d 730, 733 (9th Cir. 1979);

13 <u>Mortensen v. First Fed. Sav. & Loan Ass'n</u>, 549 F.2d 884, 891 (3d

14 Cir. 1977).  If the motion constitutes a facial attack, the Court

15 must consider the factual allegations of the complaint to be

16 true.  <u>Williamson v. Tucker</u>, 645 F.2d 404, 412 (5th Cir. 1981);

17 <u>Mortensen</u>, 549 F.2d at 891.  If, as here, the motion constitutes

18 a factual attack, however, "no presumptive truthfulness attaches

19 to plaintiff's allegations, and the existence of disputed

20 material facts will not preclude the trial court from evaluating

21 for itself the merits of jurisdictional claims." <u>Thornhill</u>, 594

22 F.2d at 733 (quoting <u>Mortensen</u>, 549 F.2d at 891).

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

**ANALYSIS**

Under the FTCA, the federal government waives its sovereign immunity for those claims arising out of "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). However, this general waiver is limited by various exceptions. Terbush v. United States, 516 F.3d 1125, 1128-29 (9th Cir. 2008).

The exception at issue in the instant case, referred to as the "discretionary function exception," exempts the Government from liability that would otherwise result from "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The purpose of the exception is to prevent "judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Terbush, 516 F.3d at 1129, quoting United States v. S.A. Empresa de Viamao Aerea Rio Grandense (Varig), 467 U.S. 797, 814 (1984).

The Supreme Court has established a two-part test to determine the applicability of the discretionary-function exception. Berkovitz v. United States, 486 U.S. 531, 536-37 (1988). The Court must first determine whether the challenged conduct involves an element of judgment. Id. at 536.

If it is established that an existing policy imposes a specific and mandatory action, then the inquiry ends and the discretionary-function exception is inapplicable. Terbush, 516 F.3d at 1129. If, on the other hand, it is established that the governmental action involves discretion, then the question becomes whether the that action is "based on considerations of public policy." Id. (quoting Berkovitz, 486 U.S. at 536-37). "Public policy has been understood to include decisions 'grounded in social, economic, or political policy.'" Id., quoting Variq, 467 U.S. at 814.

The Government bears the ultimate burden of establishing its entitlement to immunity. Blackburn v. United States, 100 F.3d 1426, 1429 (9th Cir. 1996). However, if "an established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." United States v. Gaubert, 499 U.S. 315, 324 (1991).

Accordingly, the crux of the instant dispute turns on whether the SSM imposed a mandatory duty upon the United States to replace the missing warning signs prior to Mr. Bailey's death or whether, instead, the SSM allowed Army Corps personnel to exercise some level of discretion that was grounded in social, economic, or political policy.

///

///

///

///

## 1. Whether The Governmental Action Involves Discretion

In determining whether a governmental decision involves discretion, the first potentially dispositive issue is whether a statute, rule, or regulation provides "specific directions," leaving the Government actor with "no room for choice or judgment." <u>Gaubert</u>, 499 U.S. at 324. If a federal statute, regulation, or policy mandates a specific course of action, the United States lacks the discretion necessary to seek refuge under the instant exception. <u>See</u> <u>Navarette v. United States</u>, 500 F.3d 914, 916 (9th Cir. 2008). "When a specific course of action is not prescribed, however, an element of choice or judgment is likely involved in the decision or action." <u>Terbush</u>, 516 F.3d at 1129.

In this case, relying primarily on SSM language stating, "It is also critical that missing or damaged signs be replaced or repaired in a timely manner," Plaintiffs argue that Defendant was under a mandatory duty to replace the missing signs on the Yuba River as soon as possible. This Court disagrees.

In <u>Navarette</u>, the Ninth Circuit rejected the proposition that policies requiring the Army Corps to "provid[e] the public with safe and healthful recreational opportunities while protecting and enhancing these resources" and to maintain the "health, safety, security and comfort of the customers in all aspects" stripped the government of its discretion. 500 F.3d at 916. The court instead interpreted those requirements as "general admonitions" to the Army Corps to maintain safety. <u>Id</u>. ///

8

However, the Ninth Circuit also determined, to the contrary, that a specific and mandatory duty did arise under the separate directive that "'[d]angerous terrain conditions, such as drop-offs, etc., will be properly marked or fenced.'" Id. at 917. Accordingly, general admonitions regarding safety did not rise to the level of a specific and mandatory directive but the requirement that all drop-offs be fenced or marked did. Id. at 917-18. Later, in Terbush, the Ninth Circuit similarly reasoned that regulations requiring the National Park Service ("NPS") to make determinations regarding "the extent of the rockfall hazard and the appropriate response to it," determinations that required the NPS to balance access to national parks with public safety, were discretionary judgments warranting protection. 516 F.3d at 1139.

Both of the above cases inform the instant decision. Here the SSM provides sign maintenance "guidelines." Much like the "general admonitions" present in Navarette, the term "guidelines" itself indicates that the strictures of the applicable policies were much less than mandatory. Furthermore, contrary to depriving Army Corps personnel of discretion, the SSM specifically delegated decision-making regarding local planning to local agencies stating, "The actual plan for sign placement will be developed for each project site on a site by site basis." The SSM elaborated that "[i]t is impossible for these guidelines to anticipate all conditions...Please note that to effectively sign many locations will be a difficult design and engineering challenge that may require considerable field work and the assistance of District and Division specialists before the most effective approach is developed and refined."

Accordingly, the plain language of the SSM indicates not that specific mandates were intended here, but that the manual was instead meant to act as a reference for use in local planning.

Moreover, the very language on which Plaintiffs rely to argue Defendant was under a mandatory duty to replace the missing signs "as soon as possible," itself suggests otherwise. The SSM states that it is "critical" that signs be replaced in a "timely" manner. The word "critical" is descriptive, not imperative, indicating its function as an admonition rather than an order. Furthermore, the drafters chose not to impose an arbitrary time-limit on such replacement, which is logical in light of the above SSM language delegating these decisions to local planners. Instead, the drafters suggested "timely" replacement. Timeliness, by its very nature, involves an evaluation of the relevant circumstances, and cannot be interpreted to mean only "as soon as possible." Indeed, had the drafters intended "timely" to be interpreted as "as soon as possible" or "immediately," they were free to use more exacting language.

Finally, it is apparent from reviewing the pertinent SSM sections in their entirety that the decision to bestow such discretion on local planners was not accidental. To the contrary, when the drafters of the manual chose to do so, they were quite capable of writing in mandatory form. See SSM 14.1 ("All sign colors and sign materials used must be in compliance with this manual."); see also SSM 14.7 ("Shown below are the only allowable color combinations that are to be used to warn and/or restrict boaters on a Corps water project.").

///

Nevertheless, in the sections pertinent here, the drafters made what must be viewed as conscious and express decisions not to craft such mandatory directives.  Consequently, for the above reasons, the Court determines that the SSM does not provide any specific command regarding the timeliness of sign replacement, and local government actors were left to exercise the discretion thus delegated to them.

### 2. Whether the Relevant Exercise of Discretion Was Based on Considerations of Public Policy

Having found that Defendant's decision as to the timeliness of the instant sign replacement involved an element of discretion, the Court next turns to the question of whether the exercise of that discretion was based on considerations of public policy.  The instant inquiry is necessary because, as the Supreme Court has stated, "[t]here are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish.  If one of the officials involved in this case drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply.  Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy."  Gaubert, 499 U.S. at 325 n.7.

///

///

Before proceeding, the Court observes that most cases interpreting the discretionary function exception based upon a failure to warn theory are raised in the context of either a governmental decision not to warn or a governmental failure to recognize a hazard for which it was required to issue a warning. Questions of that nature are not presently before this Court. Rather, in this case, though no signs were in place at the time of the accident that caused Mr. Bailey's death, the absence of those signs was not due to a decision that the signs were unnecessary, but was due instead to a decision as to the timeliness of sign maintenance or replacement. Nevertheless, for current purposes, the Court need not determine whether the instant replacement was "timely," but must instead consider whether the "timeliness" inquiry itself turns on social, economic, or political policy. <u>Terbush</u>, 516 F.3d at 1129. "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." <u>Gaubert</u>, 499 U.S. at 325.

In opposing the Government's claim of immunity, Plaintiffs rely heavily on a distinction drawn by the Ninth Circuit between those governmental actions based on public policy and those actions which merely reflect a departure from established safety considerations. <u>Summers v. United States</u>, 905 F.2d 1212, 1215 (9th Cir. 1990).

///

///

///

12

Summers has been interpreted to stand for the proposition that "[a] decision not to warn of a specific, known hazard for which the acting agency is responsible is not the kind of broader social, economic or political policy decision that the discretionary function exception is intended to protect." Sutton v. Earls, 26 F.3d 903, 910 (9th Cir. 1994), citing Summers at 1215-17.

Plaintiffs now argue that the Army Corps' failure to timely replace the warning signs at Daguerre Point constituted nothing more than a failure to comply with an established safety policy. Not surprisingly, the Government disagrees with Plaintiffs and argues that the challenged decision in the instant case was susceptible to a policy analysis because government actors were required to evaluate the safety of the public, the safety of employees responsible for installing signage, and the available resources. On these facts, the Court agrees with the Government.

First, Summers itself is factually distinguishable. In that case, "whenever a safety inspector found unsafe conditions or practices which posed an imminent risk of serious harm or death to the public he or she was required to take steps to abate the danger as soon as possible." Summers, 905 F.2d at 1213. Indeed, that court determined that "[a] failure to address an identified danger is inconsistent with regulations and therefore would not be covered under the FTCA's discretionary function exception." Id. at 1214.

///

///

///

13

Accordingly, the Summers Court concluded that the failure to "identify and warn of the danger to barefoot visitors of hot coals on park beaches resemble[d] more a departure from the safety considerations established in Service policies, than a mistaken judgment in a matter clearly involving choices among political, economic, and social factors." Id. at 1216. Also pertinent to that court's decision was the complete lack of any evidence indicating that social, economic, or political policy considerations actually informed the decision of whether or not to install warning signs. Valdez v. United States, 56 F.3d 1177, 1180 (9th Cir. 1995), quoting Summers at 1215.

In this case, the issue is not whether the Government negligently failed to provide any warning, but whether the Government negligently waited too long to replace existing warning signs once they had washed away. However, unlike in Summers, no mandate required to the Army Corps to act as soon as possible without regard to the relevant policy considerations. In fact, there is evidence in this case that Army Corps personnel had the discretion to, and did, balance both the scarcity of public resources and the safety of Government employees with the potential danger to the general public that might result from a delay in replacing absent signage. Accordingly, while under the facts of Summers it is easy to relegate the replacement of signs to the realm of the ministerial, to imagine nailing a warning to a tree or driving a small stake into the ground, the Army Corps in this situation was not faced with such simple installation concerns.

///

14

Rather, the Government was required to evaluate the availability

of personnel capable of navigating moving water to place heavy

signs in a turbulent river, while simultaneously ensuring that

the safety of United States' employees remained a "prime

concern."  The mandate in <u>Summers</u> left no room for such policy

judgments.

In Terbush, the Ninth Circuit similarly distinguished

Summers when it acknowledged "that courts since Summers, which

was decided before Gaubert, have marginalized its importance."

516 F.3d at 1136.  That court pointed out that Summers has been

distinguished both on its facts and because of its relative

simplicity.  Id.  The Terbush court elaborated:

> Whereas the court in Summers stated that there was no
> evidence that the NPS's failure to post warnings "was
> the result of a decision reflecting the competing
> considerations of the Service's sign policy," here, in
> contrast, the mandates of access, conservation and
> safety were at issue in the NPS's decisions in
> identifying the scope of the rockfall hazard as well as
> the appropriate means of warning the public.  The
> district court correctly observed that "the more
> fundamental defect with Plaintiffs' argument is that
> the decision cannot be boiled down to a simple
> recognition of the existence of some hazard.  The
> entire process, including identifying hazards,
> determining which hazards require a warning, and
> determining how and when and where the warning should
> proceed, involves discretion." ...[T]his process of
> identifying and responding to hazards in the wild
> implicates the NPS's broader policy mandates to balance
> access with conservation and safety.  Summers, then,
> appears out of step with our other NPS failure to warn
> cases decided post-Gaubert.

///

///

///

///

///

15

Terbush, 516 F.3d at 1136-1137.[2]  Accordingly, it is this Court's decision that Summers is not controlling here.

Plaintiffs next attempt to minimize the policy considerations inherent in the Army Corps' decision by casting the replacement of signs as routine maintenance.  This argument is not well taken.  While the Terbush Court stated, "Our case law directs that, by nature, matters of routine maintenance are not protected by the discretionary function exception because they generally do not involve policy-weighing decisions or actions," that Court went on to acknowledge that "[l]ooking to other circuits, we observe that sometimes 'maintenance' is far from routine and may involve considerable discretion that invokes policy judgment."  Id. at 1133-1134 (internal citations omitted).  As previously discussed, the maintenance at issue here was atypical and invoked just those sorts of policy judgments.

In this case, signs warning of a waterway hazard were presumably washed away by flood waters.  The Army Corps is alleged to have had knowledge that the signs were missing as of May 19, but, even on May 25, after assessing the current conditions, the Government determined it was still unsafe to navigate those same waters to attempt to replace the signs.

///

_____

[2] The Ninth Circuit acknowledged in a related footnote, "Of course, after Gaubert we do not need actual evidence that policy-weighing was undertaken.  Other courts have also limited Summers' impact on this very basis."  Terbush, 516 F.3d at 1137 n.5.  Because there is evidence in the instant record that the Army Corps actually engaged in the above-discussed policy analysis, this evidentiary distinction does not alter the current decision.  Nevertheless, such an observation does nothing to bolster the strength the case on which Plaintiffs rely.

In making that decision, the Army Corps had to consider, *inter alia*, whether a mid-river sandbar could safely be reached in a vehicle, and whether the two to three persons needed to install the signs were available. Personnel balanced these concerns against the possibility of injury to members of the general public. Despite the fact that such injury actually came to fruition in its gravest form, the Army Corps' decision cannot be cast merely as routine maintenance. Thus, Plaintiffs' arguments to the contrary are rejected.

Similarly, Plaintiffs' characterization of the issue in this case as an unprotected failure to implement the established sign plan also must fail. Plaintiffs argue that "[t]he decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not..." Terbush, 516 F.3d at 1133, quoting Whisnant v. U.S., 400 F.3d 1177, 1182 (9th Cir. 2005). However, the facts of this case, in which the safety of Army Corps personnel was of paramount importance, fit more seamlessly into the exception to that rule than into the rule itself. The Ninth Circuit has stated, "The implementation of a government policy is shielded where the implementation itself implicates policy concerns, such as where government officials must consider competing fire-fighter safety and public safety considerations in deciding how to fight a forest fire." Id., citing Whisnant, 1181 n.3. In evaluating decisions made in the maintenance of a wastewater system, the Terbush court rejected application of the exception. However, notably lacking in that case, but central to the Army Corps decision here, were any considerations of the safety of Government employees.

17

See Terbush, 516 F.3d at 1133. Accordingly, the Court finds that, even if the Army Corps' instant decision is cast as merely "implementation," Defendant is entitled to immunity.

In sum, though it has been said that "past cases in this circuit...have only applied the discretionary function exception in failure to warn cases where a unique circumstance has required the governmental employees to make a policy-based judgment that is usually not necessary to the implementation of a safety program," the instant facts present just the sort of unique set of circumstances for which the discretionary function exception provides protection. Faber v. United States, 56 F.3d 1122, 1127 (9th Cir. 1995). Army Corps employees were required to make a judgment call as to whether the considerations of public safety outweighed, *inter alia*, risks to their own safety or the expenditure of resources on signs that might once more wash away. While one might not agree with the decision ultimately reached, the decision-making process itself is protected, and the Government is immune from suit.

///
///
///
///
///
///
///
///
///
///

**CONCLUSION**

Accordingly, for the above reasons, Defendant's Motion to Dismiss for lack of subject matter jurisdiction is GRANTED with prejudice.[3]  The Clerk of the Court is directed to close the file.

IT IS SO ORDERED.

Dated: April 16, 2009

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

---

[3] Because oral argument will not be of material assistance, the Court ordered this matter submitted on the briefing.  E.D. Cal. Local Rule 78-230(h).