**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BRIGID BAILEY, individually, as the
Personal Administrator for the
ESTATE OF JOSEPH PAUL BAILEY,
Deceased, and as Guardian Ad
Litem for SAMUEL P. BAILEY and
PAUL F. BAILEY, and MEGHAN
BAILEY,

        *Plaintiff-Appellant,*

        v.

UNITED STATES OF AMERICA,
        *Defendant-Appellee.*

No. 09-16247

D.C. No.
2:07-cv-02154-
MCE-DAD

OPINION

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, District Judge, Presiding

Argued and Submitted
March 9, 2010—San Francisco, California

Filed September 29, 2010

Before: Betty B. Fletcher, Richard R. Clifton and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea;
Dissent by Judge B. Fletcher

16597

BAILEY v. UNITED STATES

## COUNSEL

Gregory D. Rueb and Dirk Manoukian, Rueb Motta & Manoukian, Concord, California, for the appellant.

Toney West, Assistant Attorney General, Lawrence G. Brown, United States Attorney, Mark B. Stern, and Matthew D. Burton, Attorneys, Appellate Staff Civil Division, Department of Justice, Washington, DC, for the appellee.

## OPINION

BEA, Circuit Judge:

On Memorial Day weekend 2005, John Bailey rowed his boat over a submerged dam on the Yuba River in Northern California. The boat foundered, and Bailey drowned. The Army Corps of Engineers ("the Corps") had placed signs warning of the dam, mid-river upstream of, and on the banks near the dam. However, recent heavy river flows had washed the signs away. Four days before Bailey met his sad fate, the Corps had attempted to replace the warning signs, but had judged that the Yuba was so turbulent as to threaten the safety of its workers who had to ford the river to attach new signs and buoys.

Bailey's widow and children brought suit claiming the government was negligent in the Corps' failure to place the warning signs.

The district court granted a motion to dismiss the Baileys' complaint on grounds the Federal Torts Claims Act ("FTCA") provided the government immunity from suit under the facts alleged and shown, because the decision not to place the warning signs on account of worker peril was a discretionary decision commended by Congress for decision by the Corps, not to be second-guessed by a court or jury.

Mrs. Bailey and her children appeal. We conclude the discretionary function exception to liability applies. The district court acted correctly, and we affirm.

## I.   Facts and Procedural Background.

The Daguerre Point Dam is a submerged,[1] debris-control dam on the Yuba River in Northern California that is managed and operated by the Army Corps of Engineers ("the Corps"). The Corps's management duties include posting signs to warn recreational boaters that the dam presents a hazard. In 1987, the Corps promulgated the Sign Standards Manual ("SSM"). The SSM tells the Corps how "to provide appropriate signs and markers at each project to guide, inform, and protect visitors and employees." With respect to sign maintenance and replacement, the SSM requires "that damaged signs be reported as soon as the problem is noticed so that the necessary maintenance work can be scheduled and completed in a timely manner." The SSM further states that "[i]t is also critical that missing or damaged signs be replaced or repaired in a timely manner." However, the SSM also declares that, "[p]ersonnel safety is a prime concern in performing sign maintenance."

Although the 1987 SSM provides guidelines regarding warning signs, it does not dictate the placement of signs at any given location operated by the Corps. Rather, it states that

---

[1]A submerged dam is not visible upstream because the dam's structure is under water.

"[e]xisting conditions must be evaluated on a site-by-site basis followed by the development of a sign plan using the signs and engineering criteria contained in this section." Pursuant to this SSM language, the Corps developed a sign plan for the Daguerre Point Dam that specifies exactly where warning signs should be placed along the Yuba River upstream from the dam, as well as a sign inventory that contains specific details about each sign. The sign plan requires placement of several permanent signs, such as signs on the dam abutments that say "Danger-Keep Back," signs that say "Raft Portage," and a sign four miles upstream that says "Warning-Submerged Dam 4 Miles Downstream." Because of increased river usage in the spring and summer months, the sign plan also calls for seasonal warning signs to be placed along the south bank of the Yuba River and on a mid-river sand bar downstream of the four-mile warning sign. The Corps also installed a mid-river warning buoy.

Installing the signs on the sand bar and installing the buoy are the most difficult tasks of sign-posting because they require Corps workers to navigate the river. Installing the sand bar signs requires the workers to drive two trucks through the river to the sandbar; installing the buoy requires a worker to wade out into the river and anchor it underwater. Thus, to replace any signs, conditions on the river have to be safe, and the water flow and water levels have to be low enough to allow workers to do this.

In late April 2005, the Corps installed these seasonal warning signs. However, around May 19, 2005, there were unexpectedly heavy water flows on the Yuba River, and soon thereafter, the Corps learned that the warning signs had been submerged or washed away. On May 25, 2005, Corps workers went to the river to assess if it was possible to replace the signs. They could not get to the location where the signs had been placed because of the high, fast water and dangerous river conditions.

On May 29, 2005, during Memorial Day Weekend, Joseph Bailey took his two sons rafting on the Yuba River, starting approximately six miles upstream of the Daguerre Point Dam. There were no warning signs about the dam anywhere upriver of the dam; there were only warning signs on the dam abutments. These came too late. Bailey and his sons went over the dam; the two sons survived, but Joseph was caught in the spill water and drowned. The next day, the Corps replaced the missing signs.

Joseph Bailey's survivors brought suit on his behalf against the Corps under the Federal Tort Claims Act. In their complaint they alleged the Corps negligently failed to replace the missing warning signs before the busy Memorial Day weekend. The Corps moved for summary judgment, or alternatively to dismiss the case under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. The district court held that the discretionary function exception shielded the Corps from suit, and therefore granted the Corps's motion to dismiss for lack of subject matter jurisdiction. This appeal timely followed.

## II.   Standard of Review.

We review de novo the district court's decision to grant a motion to dismiss for lack of subject matter jurisdiction under the discretionary function exception. *Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008). The United States bears the burden of proving the applicability of the discretionary function exception. *Id.*

## III.   Analysis.

**[1]** The FTCA waives the federal government's sovereign immunity for tort claims arising out of the negligent conduct of government employees and agencies in circumstances where the United States, if a private person, would be liable to the claimant under the law of the place where the act or

omission occurred. *Id.* at 1128-29. However, the discretionary function exception provides the government an immunity from suit that private persons do not have: for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

The discretionary function exception is a limit placed by Congress on its waiver of traditional sovereign immunity from suit; it "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). "The basis for the discretionary function exception was Congress' desire to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 536-37 (quotation marks omitted).

The Supreme Court has created a two-step test for courts that governs the applicability of this exception. *Terbush*, 516 F.3d at 1129. The first step is to determine whether a federal statute, regulation, or policy mandated a specific course of action,[2] or whether the government actor retained an element of judgment or choice with respect to carrying out the chal-

---

[2]State tort law duties are not relevant to the determination whether the discretionary function exception applies. *See Mitchell v. United States*, 787 F.2d 466, 468 (9th Cir. 1986) ("Mitchell argues that 'BPA was without discretionary authority to breach the duty of care imposed by Washington law.' Negligence, however is irrelevant to the discretionary function issue."). It is only after we determine as a matter of federal law that the discretionary function exception does not apply that we then evaluate whether the government can be held liable under the laws of the state where the act or omission took place. *See* 28 U.S.C. §§ 1346(b) and 2680(a).

lenged action. *Id.* If the government action did involve choice or judgment, the second step is to determine "whether that judgment is of the kind that the discretionary function exception was designed to shield, namely, only governmental actions and decisions based on considerations of public policy." *Id.* (quotation marks omitted). If the challenged action or omission satisfies these two prongs, the government is immune from suit based on that action or omission—and federal courts lack subject matter jurisdiction—even if that action or omission constituted an abuse of discretion or was a wrong choice under the circumstances. *Id.*

### A. The first step: the Corps had to exercise its judgment to determine when to replace the missing signs; nothing mandated a specific time for replacement.

**[2]** An agency does not retain discretion whether to act where a statute or policy directs mandatory and specific action and the agency has no lawful option but to adhere to the directive. *Navarette v. United States*, 500 F.3d 914, 916 (9th Cir. 2007). On the other hand, an agency retains discretion whether to act where no statute or agency policy dictates the precise manner in which the agency is to complete the challenged task. *Miller v. United States*, 163 F.3d 591, 595 (9th Cir. 1998). In *Miller*, the plaintiff sued the United States Forest Service under the FTCA for its allegedly negligent handling of a forest fire that spread from the Ochoco National Forest onto Miller's property and caused damage. *Id.* at 592. The district court granted the Forest Service's motion for summary judgment on the ground the discretionary function exception applied. *Id.* We affirmed. *Id.*

We held the first prong of the discretionary function exception was met because there were "no specific directives that mandate[d] specific action in a multiple fire situation." *Id.* at 595. Although there were general firefighting guidelines, those guidelines "[did] not eliminate discretion because they

. . . did not tell the Forest Service to suppress the fire in a spe-
cific manner and within a specific period of time." *Id.*[3]

**[3]** Likewise here, no regulation or guideline required the
Corps to replace the missing signs before a busy weekend or
within a specific period of time after receiving notice the
signs were gone. The Corps's sign manual states only "that
missing or damaged signs must be replaced or repaired in a
*timely* manner." (Emphasis added.) Although this does strip
the Corps of its discretion *whether* to replace missing or dam-
aged signs,[4] it does not create a mandatory and specific direc-
tive regarding *when* the Corps must replace any missing or
damaged signs. Rather, the determination of when to replace
the signs is left to the discretion of the Corps.

Once an agency has discretion with respect to the chal-
lenged action, we must move on to step two. This is because
the discretionary function exception provides immunity even
to abuses of discretion. 28 U.S.C. § 2680(a). Here, the Corps
had discretion to determine what constituted "timely" replace-
ment of the missing warning signs. Therefore, the first prong
of the discretionary function exception is met and we move on
to the second step.

## B.  The second step: the timeliness decision is susceptible to policy analysis.

**[4]** Only discretionary decisions that are susceptible to
public policy analysis confer immunity on the government
under the FTCA; "[t]he challenged decision need not be actu-
ally grounded in policy considerations." *Miller*, 163 F.3d at
593. So, even though the Corps retained discretion to decide
when to replace the missing signs, it could still be liable for

---

[3]As discussed more fully below, we also held that the Forest Service's
decisions regarding how to fight a forest fire were susceptible to policy
analysis. *Miller*, 163 F.3d at 595-96.

[4]The Corps did replace the missing signs on May 30, 2005.

a negligent decision unless its decision is susceptible to a public policy analysis. *See id.* at 595. "Public policy has been understood to include decisions grounded in social, economic, or political policy." *Terbush*, 516 F.3d at 1129 (quotation marks omitted).

**[5]** We have noted that, although an agency's decision to adopt certain safety precautions as opposed to others may be based in policy considerations, generally, "the implementation of those precautions is not. Safety measures, once undertaken, cannot be shortchanged in the name of policy." *Whisnant v. United States*, 400 F.3d 1177, 1182 (9th Cir. 2005) (alterations omitted). However, "[t]he implementation of a government policy *is* shielded where the implementation itself implicates policy concerns, such as where government officials must consider competing fire-fighter safety and public safety considerations in deciding how to fight a forest fire." *Id.* at 1182 n.3 (citing *Miller*, 163 F.3d at 595-96).**⁵**

**[6]** In *Miller*, we held that the implementation of a government safety program with respect to fighting forest fires did require the agency to balance competing policy interests, and thus, the discretionary function exception applied. We noted that "the Forest Service's decision regarding how to attack a fire involved balancing considerations including cost, public safety, firefighter safety, and resource damage." 163 F.3d at

---

**⁵**Whisnant sued the government under the FTCA. 400 F.3d at 1179. He alleged the government had negligently failed to discover and abate a mold problem in the commissary of one of its naval bases and that he contracted pneumonia as a result. *Id.* The government filed a Rule 12(b)(1) motion to dismiss on the ground the suit was barred under the discretionary function exception. *Id.* at 1180. The district court granted the motion. *Id.* On appeal, we reversed. *Id.* at 1185. We held that, "removing an obvious health hazard is a matter of safety, not policy." *Id.* However, we implied that inspecting the commissary did not involve balancing competing safety considerations—there was no claim, nor was there any evidence that inspection for mold posed a risk to agency personnel, nor any evidence such risk was considered by the agency. *Id.* at 1182 n.3.

595. We then held that "[t]hese considerations reflect the type of economic, social and political concerns that the discretionary function exception is designed to protect." *Id.* Thus, when a decision requires an agency to balance competing safety considerations, that decision *is* susceptible to a policy analysis. *See id.* at 596 ("Where the government is forced, as it was here, to balance competing concerns, immunity shields the decision.").

**[7]** As with the Forest Service's decision in *Miller*, the Corps's decision here regarding when to replace the missing signs on the Yuba River required the Corps to balance competing policy interests. The Corps had to balance the safety of its workers and the risk to its other limited resources, i.e., its equipment, in replacing the signs in dangerous conditions against the competing public safety interest in having the signs replaced sooner. Indeed, the record establishes that Corps "[s]taff attempted to assess the situation on May 25, 2005, but could not get to the location where the signs had been placed either on the gravel/sand bar or on the South banks of the river because of the high, fast water and dangerous conditions." So, as in *Miller*, although the Corps was implementing a safety program when it was deciding when to replace the washed-out signs, in doing so it had to balance competing policy interests: the safety of boaters and the safety of its sign-placing workers and their equipment. Therefore, under the discretionary function exception, the Corps's discretionary decision as to when to replace the signs is susceptible to policy analysis and is immune from suit.

Although the dissent correctly contends that safety considerations generally are not policy considerations, it ignores our law that establishes that balancing *competing* safety considerations *is* a protected policy judgment.[6] *See id.* The dissent is

---

[6]The dissent cites *Faber v. United States*, 56 F.3d 1122, 1125 (9th Cir. 1995) and *Whisnant* for the proposition that safety considerations are not policy considerations. Although those cases did deal with government

correct that in *Miller* there were other types of policy considerations in addition to safety that went into the Forest Service's discretionary judgment about how to fight the forest fire, but that does not detract from *Miller*'s holding that balancing competing safety considerations *is* a policy judgment. Moreover, so long as a decision involves even two competing interests, it is "susceptible" to policy analysis and is thus protected by the discretionary function exception. *See Alfrey v. United States*, 276 F.3d 557, 565 (9th Cir. 2002) (holding that "[a] prison official's judgment about how extensively to search a cell involves a balancing of the potential risk [from the reported threat], on the one hand, against the inmate's interest in being free from overly intrusive searches, on the

---

safety programs, the implementation of those programs did not involve balancing *competing* safety considerations. Weighing two competing safety interests and making a decision in favor of one interest or the other *is* a protected policy judgment. *See Whisnant*, 400 F.3d at 1182 n.3 ("The implementation of a government policy *is* shielded where the implementation itself implicates policy concerns, such as where government officials must consider *competing* firefighter safety and public safety considerations . . . ." (emphasis added)); *Miller*, 163 F.3d at 596 ("Where the government is forced, as it was here, to balance *competing* concerns, immunity shields the decision." (emphasis added)). The dissent contends that we are relying on this footnote in *Whisnant* —which the dissent characterizes as "dicta"—to overrule the holding of *Whisnant*. That is simply not the case. *Whisnant* held that the government's failure to discover mold at a naval commissary, which it was required to inspect—although no statute, regulation or policy prescribed the precise manner in which the commissary was to be inspected—was not susceptible to policy analysis. 400 F.3d at 1183. The footnote merely contrasts *Whisnant*'s holding by recognizing the holding of *Miller*: a decision that requires an agency to balance competing safety considerations is protected by the discretionary function exception. It also recognizes that the holding of *Miller* did not apply to the facts in *Whisnant*; that is, the government's failure to discover mold at the commissary during its safety inspections did not involve the balance of competing safety considerations. There was no evidence that mold inspectors place themselves at risk when inspecting mold. Here, the Corps's decision when to replace the missing signs *did* require it to balance competing safety considerations. Thus, nothing in our opinion today conflicts with *Whisnant*.

16610                    BAILEY v. UNITED STATES

other," and that this balancing was sufficient to immunize the
government from plaintiff's claim that the guards negligently
searched his cell). Here, the competing interests the Corps had
to balance in determining when to replace the missing warn-
ing signs were public safety versus Corps worker safety, as
well as the safety of its equipment in the fast river. Thus, the
Corps's decision regarding when to replace the missing warn-
ing signs is susceptible to policy analysis and is immune as
a basis of suit.

   In hindsight it may be easy to say the Corps should have
replaced the signs sooner, but that is exactly the judicial
second-guessing of government decision-making that the dis-
cretionary function exception is designed to prevent. As we
stated in *Miller*, "[o]ur task is not to determine whether the
Forest Service made the correct decision in its allocation of
resources. Where the government is forced, as it was here, to
balance competing concerns, immunity shields the decision."
163 F.3d at 596. The Corps had to balance competing policy
interests in deciding when to replace the missing signs. There-
fore, immunity shields its decision.

   **AFFIRMED**

_____

B. Fletcher, Circuit Judge, dissenting:

   I respectfully dissent.

   The majority holds that the Corps' decision to delay replac-
ing the Daguerre Point Dam warning signs is protected by the
discretionary function exception because that decision
required the Corps to balance employee safety and public
safety. I strongly disagree. The exception "protects only gov-
ernmental actions and decisions based on considerations of
public policy." *Berkovitz v. United States*, 486 U.S. 531, 537

(1988). Safety considerations — competing or otherwise —
are not policy considerations.

According to the majority, not only does the discretionary
function exception cover decisions that require the govern-
ment to balance competing *safety* considerations, but it covers
decisions that involve *any* competing considerations. *See* Maj.
Op. at 16609 ("[S]o long as a decision involves even two
competing interests, it is 'susceptible' to policy analysis and
is thus protected by the discretionary function exception.");
Maj. Op. at 16610 ("Where the government is forced, as it
was here, to balance competing concerns, immunity shields
the decision." (internal quotation marks omitted)). Such a
holding is both gratuitous and absurd. All decisions require
balancing. There are always trade-offs. Every action has both
costs and benefits. *See generally* Milton Friedman, *There's
No Such Thing as a Free Lunch* (1975). If the discretionary
function exception is triggered any time the government has
to balance "even two competing interests," Maj. Op at 16609,
then the exception covers every decision ever made by the
federal government. I cannot endorse such a result.

I would hold that the district court erred in dismissing this
suit and I would remand for further proceedings.

## I.  Daguerre Point Dam Sign Plan

The Corps' sign plan for the Daguerre Point Dam is very
specific. The plan requires the Corps to post several perma-
nent warning signs on the Yuba River, including a sign four
miles upstream from the dam that says "Warning-Submerged
Dam 4 Miles Downstream," a number of signs that read "Raft
Portage," and signs on the dam abutments that say "Danger-
Keep Back."

A portion of the river upstream from the dam is popular
with pleasure boaters in the spring and summer months.[1] The

---

[1]Submerged dams like the Daguerre Point Dam are particularly hazard-
ous for pleasure boaters. Such dams are difficult to see from low riding

Daguerre Point Dam sign plan requires the Corps to post sea-
sonal signs that clearly instruct boaters to portage when they
approach the submerged dam. Two seasonal signs are placed
on a gravel bar in the middle of the river and read, respec-
tively, "Warning – Submerged Dam 1500 Downstream" and
"Danger – Submerged Dam Ahead Take Out Now." On the
south bank of the river, seasonal signs direct boaters to points
on the bank where they should ground their boats and begin
to portage. These signs read "←Raft Portage" and "Danger –
Submerged Dam Ahead – Take Out This Side." The sign plan
also calls for the Corps to anchor a buoy in the middle of the
river that directs boaters "←Take Out." In no uncertain terms,
these signs make clear that boaters must begin to portage well
before they near the dam.

None of these signs, according to the Complaint, were in
place when Mrs. Bailey's husband and children began to raft
down the Yuba River. The only warning signs posted were
the "Danger-Keep Back" signs on the dam itself, and they
came too late. As a result, Mr. Bailey and his sons had no
knowledge of the dam and were never instructed to take their
raft out of the water. Mrs. Bailey argues that, had the Corps
timely replaced the warning signs that had been washed away
in May 2005, her husband would have known that the sub-
merged Daguerre Point Dam lay ahead, taken his boat out of
the water as instructed, and survived.

## II.  Warning Signs on the Banks of the Yuba River

The discretionary function exception covers decisions by
the federal government that are "grounded in social, eco-
nomic, and political policy." *United States v. S.A. Empresa de
Viacao Aerea Rio Grandense* (*Varig Airlines*), 467 U.S. 797,
814 (1984). The majority concludes that the Corps decision to

---

boats and create strong reverse currents downstream that can pull small
boats into the face of the dam.

delay replacing the warning signs is protected by the exception because that decision required the Corps to balance the safety of the public against the safety of its employees.

If we assume that balancing competing safety considerations requires policy judgment — and I argue below that it does not — then it follows that the discretionary function exception covers only the Corps' decision to delay replacing the two seasonal signs on the gravel bar in the middle of the river, the buoy anchored to the bottom of the river and the signs on the south bank. To place those signs, Corps employees must drive or wade out into the river, a task that was made dangerous in May 2005 by unusually high water flows on the Yuba River.

Douglas Grothe, an employee of the Army Corps of Engineers, indicated in his declaration supporting the Corps' motion for summary judgment that if called as a witness he would testify that he is an employee of the Corps and that among his duties he managed all the recreation areas, including operating and managing the Daguerre Point Dam; that his "[s]taff attempted to assess the situation [of the washed-out signs] on May 25 but could not get to the location where the signs had been placed either on the gravel/sand bar or on the south banks of the river because of the high, fast water and dangerous conditions. On May 30, 2005 staff confirmed by visual inspection that the signs were missing and we decided that it was safe for our employees to begin replacing the missing signs. The work to replace those signs began the same day." The fatal accident occurred the previous day, May 29, 2005.

Nowhere does the Corps assert that turbulent water made it difficult for employees to post warning signs on the north bank of the river upstream from the dam — for example, the "permanent" signs, such as signs on the dam abutments that say "Danger-Keep Back," signs that say "Raft Portage," and a sign four miles upstream that says "Warning-Submerged

Dam 4 Miles Downstream." According to the majority's own analysis, the Corps' decision to delay replacing some of the signs required by the Daguerre Point Dam sign plan involved no choice between competing safety concerns and thus were not covered by the discretionary function exception. This alone requires reversal and a remand.

### III.   The Corps Decision Implicated Only Safety Considerations, Not Policy Considerations

"The decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not." *Whisnant v. United States*, 400 F.3d 1177, 1182 (9th Cir. 2005) (internal quotation marks omitted); *see also Terbush v. United States*, 516 F.3d 1125, 1133 (9th Cir. 2008) ("[M]atters of routine maintenance are not protected by the discretionary function exception . . . ."). For example, in *Indian Towing Co. v. United States*, 350 U.S. 61, 69-70 (1955), the Supreme Court held that the Coast Guard could be sued under the FTCA for failing to maintain a light house, and in *Whisnant*, 400 F.3d at 1181-85, the Ninth Circuit held that the United States could be sued for failing to eradicate mold at a naval commissary. *See also Bolt v. United States*, 509 F.3d 1028, 1034-35 (9th Cir. 2007) (holding that snow removal in parking lot involved routine maintenance and was, therefore, not protected by the discretionary function exception); *Soldano v. United States*, 453 F.3d 1140, 1150-51 (9th Cir. 2006); *O'Toole v. United States*, 295 F.3d 1029, 1035-37 (9th Cir. 2002) (holding that Bureau of Indian Affairs could be held liable for neglecting to maintain an irrigation system).

The Corps' initial decision to adopt the Daguerre Point Dam sign plan may have taken into account policy considerations — for example, ensuring public access and protecting the environment. *See Terbush*, 516 F.3d at 1135-37; *Childers v. United States*, 40 F.3d 973, 975-76 (9th Cir. 1994)*; but see Oberson v. U.S. Dep't of Agric.*, 514 F.3d 989, 998 (9th Cir. 2008); *Faber v. United States*, 56 F.3d 1122, 1127-28 (9th

BAILEY v. UNITED STATES                    16615

Cir. 1995). However, the Corps' subsequent decision to delay replacing the missing signs did not implicate such concerns. The policy decision was made when the Corps adopted the Daguerre Point Dam sign plan. All that was left was for the Corps to exercise its "professional judgment" in solving the logistical problem of how to overcome the turbulent water, or alternatively in deciding how long to wait for the water to subside. *Whisnant*, 400 F.3d at 1185. Because Mrs. Bailey is not arguing that the Corps should have adopted a better sign plan, but instead is challenging the Corps' failure to properly implement the existing plan, we should allow her suit to proceed.

It is true that the discretionary function exception applies to the implementation of a pre-existing safety plan when "the implementation itself implicates policy concerns." *Id.* at 1182 n.3. The majority believes that such is the case here because the Corps had to balance the safety of the public against the safety of its own employees. The Corps certainly had to make a judgment call, but not one that involved policy concerns. The case law is clear that safety considerations are not policy considerations. *See, e.g., Navarette v. United States*, 500 F.3d 914, 919 (9th Cir. 2007) (holding that United States not immune because decision to warn involved "safety considerations under an established policy, rather than the balancing of competing policy considerations" (internal quotation marks omitted)); *Whisnant*, 400 F.3d at 1181 ("[M]atters of scientific and professional judgment — particularly judgments concerning safety — are rarely considered to be susceptible to social, economic, or political policy."); *Miller v. United States*, 163 F.3d 591, 596 (9th Cir. 1998) ("[S]afety is not a consideration based on policy."); *Faber*, 56 F.3d at 1125 ("[A] failure to warn involves considerations of safety, not public policy.").[2] Because the Corps considered only safety

---

[2] *See also Oberson*, 514 F.3d at 998; *Bolt*, 509 F.3d at 1034; *Soldano*, 453 F.3d at 1150-51; *Sutton v. Earles*, 26 F.3d 903, 910-11 (9th Cir.

factors when it decided to delay replacing the missing warn-
ing signs, that decision is not protected by the discretionary
function exception.

## IV. Balancing Competing Safety Considerations Does Not Require Policy Judgment

The majority acknowledges that safety considerations are
not policy considerations, but concludes that "balancing *com-
peting* safety considerations *is* a protected policy judgment."
Maj. Op. at 16608. This conclusion is based on a footnote in
*Whisnant* where the court pointed to *Miller v. United States*,
163 F.3d 591, 595-96 (9th Cir. 1998), as an example of a case
where the implementation of a safety precaution implicated
policy considerations. *Whisnant*, 400 F.3d at 1182 n.3. The
court observed that *Miller* was a case where the government
had to "consider competing firefighter safety and public
safety considerations in deciding how to fight a forest fire."
*Id*. Because the Corps also had to balance employee and pub-
lic safety, the majority concludes that *Whisnant* requires dis-
missal. This short statement from *Whisnant* is too thin a reed
for the majority to rest its entire decision upon it. The line is
*dicta*, as *Whisnant* was not a case where employee safety was
a concern or where the decision to implement a safety precau-
tion implicated policy considerations. More importantly,
when the footnote is read in context, it is clear that the court
was giving a shorthand description of *Miller* when it summa-
rized the case as one involving competing safety consider-
ations, not creating a new rule of law providing that balancing
competing safety considerations requires policy judgment.

---

1994); *Ariz. Maint. Co. v. United States*, 864 F.2d 1497, 1504 (9th Cir.
1989); *Seyler v. United States*, 832 F.2d 120, 123 (9th Cir. 1987); *ARA
Leisure Services v. United States*, 831 F.2d 193, 195 (9th Cir. 1987); *cf.
Miller v. United States*, 163 F.3d 591, 596 (9th Cir. 1998) (holding that
United States immune because it had to consider more than safety when
making the challenged decision); *Lesoeur v. United States*, 21 F.3d 965,
970 (9th Cir. 1994) (same).

The majority's interpretation of the *Whisnant* footnote cannot be correct because it is contrary to the central holdings of *Whisnant* and *Miller*. Both cases compel the conclusion that the Corps' decision in this case is not covered by the discretionary function exception. The *Whisnant* court explained that "matters of scientific and professional judgment — particularly judgments concerning safety — are rarely considered to be susceptible to social, economic, or political policy." *Id.* at 1181. Because "the governmental decisions Whisnant claim-[ed] were negligent concerned technical and professional judgments about safety," the court concluded that the discretionary function exception did not apply. *Id.* at 1185. By the same token, because Mrs. Bailey is challenging a decision by the Corps that concerned only technical and professional judgments about safety, that decision is also not covered by the discretionary function exception.

The decision in *Miller* is even more clear that balancing competing safety considerations does not require policy judgment. The Millers sued the Forest Service for damages to their property from a forest fire. The court began by observing that the Forest Manual requires the Forest Service to take into account "cost, public safety, firefighter safety, and resource damage" when fighting fires. 163 F.3d at 595. After acknowledging "that safety is not a consideration based on policy," the court went on to observe that, "[w]hile safety was one consideration, the decision regarding how to best approach the Bald Butte fire also required consideration of fire suppression costs, minimizing resource damage and environmental impacts, and protecting private property." *Id.* at 596. Based on those non-safety considerations, the court concluded that the discretionary function exception applied. *Id.* 597. The court in *Miller* clearly held that the Forest Service's decision was protected by the discretionary function exception because that decision involved considerations *other than* public and firefighter safety.[3]

---

[3]The majority ignores the central holding of *Miller* and focuses instead on *Miller*'s statement that "the Forest Service's decision regarding how to

Instead of considering the central holdings and reasoning of *Whisnant* and *Miller*, the majority focuses exclusively on a brief footnote in *Whisnant* that describes *Miller* as a case where the Forest Service had to balance employee and public safety. The footnote's description of *Miller* is not wrong — the Forest Service did indeed have to strike that balance — but the majority's interpretation of it is wrong.

It is important to understand *Miller* in context. Its decision to let the Bald Butte fire to burn and to destroy the Millers' property involved far more than safety concerns. Several forest fires caused by lightning took place almost simultaneously. Resources were stretched thin. Whose property should be saved was difficult and heart-wrenching. The *Miller* court faced with these facts stated: "While safety was one consideration, the decision regarding how to best approach the Bald Butte fire also required consideration of fire suppression costs, minimizing resource damage and environmental impacts, and protecting private property. The discretionary function exception is designed to prevent the judiciary from using its power to police the decisions of the executive

---

attack a fire involved a balancing of considerations, including cost, public safety, firefighter safety, and resource damage," considerations that "reflect the type of economic, social and political concerns that the discretionary function exception is designed to protect." *Id.* at 595. Based on this sentence, the majority interprets *Miller* as holding that the listed factors, although they may be non-policy considerations when taken alone, transform into policy considerations when they are balanced against one another. *See* Maj. Op. at 16608.

If the majority's reading is correct, then *Miller* holds that the discretionary function exception applies when the government balances safety against cost, two of the factors listed. But it is black letter law that the discretionary function exception does not cover decisions that require the government to weigh increased safety against the cost of additional precautions. *See Terbush*, 516 F.3d at 1134 & n.4; *Whisnant*, 400 F.3d at 1184; *O'Toole*, 295 F.3d at 1037 ("Every slip and fall, every failure to warn, every inspection and maintenance decision can be couched in terms of policy choices based on allocation of limited resources.").

branch. Our task is not to determine whether the Forest Service made the correct decision in its allocation of resources. Where the government is forced, as it was here, to balance competing concerns, immunity shields the decision." *Id.* at 596.

Unlike the Forest Service's decision in *Miller*, the Corps' decision to delay replacing the Daguerre Point Dam warning signs did not implicate considerations other than safety. Mrs. Bailey's suit must be allowed to proceed.

## V. The Majority's Decision is Inconsistent with the Overarching Purpose of the FTCA

The majority's conclusion also is inconsistent with the "broad and just purpose" of the Federal Tort Claims Act, which is "to compensate the victims of negligence in the conduct of governmental activities in circumstances like unto those in which a private person would be liable and not to leave just treatment to the caprice and legislative burden of individual private laws." *Indian Towing Co.*, 350 U.S. at 68-69; *see also* 28 U.S.C. § 1346(b)(1). "It would be wrong to apply the discretionary function exception in a case where . . . [the government's] judgment would be no different than a judgment made by a private individual not to take certain measures to ensure the safety of visitors." *Faber*, 56 F.3d at 1125. A private landowner in the Corps' position would have had to consider the exact same factors the Corps did when deciding to delay replacing the warning signs. This is exactly the kind of scenario that Congress intended to be covered by the FTCA. *See Dalehite v. United States*, 346 U.S. 15, 28 (1953) ("Uppermost in the collective mind of Congress were the ordinary common-law torts."), *partially overruled on other grounds by Rayonier Inc. v. United States*, 352 U.S. 315 (1957).[4]

---

[4]*See Varig Airlines*, 467 U.S. at 813 n.10 (noting that "fundamental aspects of *Dalehite*, including its construction of [the discretionary function exception], remain undisturbed" after *Rayonier*).

The discretionary function exception marks the boundary between those situations where the government is acting in its legislative or regulatory capacity and those where it is acting as any private person might. *See Varig Airlines*, 467 U.S. at 813-14; *Dalehite*, 346 U.S. at 27-28. By preserving sovereign immunity for the former category of government actions, the exception "prevent[s] judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Varig Airlines*, 467 U.S. at 814. If this suit were to proceed, the district court would not usurp the Corps as supervisor and regulator of the Daguerre Point Dam. The Corps would still have responsibility for deciding how to run the dam, what hazards warrant safety precautions, and what those safety precautions should entail. But having made that decision, it would then be left for the court to determine whether the Corps was obeying applicable laws, its own rules and safety plans, and the common law. *Dalehite*, 346 U.S. at 34 ("The 'discretion' protected by the section is not that of the judge — a power to decide within the limits of positive rules of law subject to judicial review."). This sort of second-guessing is not the kind prohibited by the discretionary function exception, it is the kind that a court must undertake in any garden variety tort case. The discretionary function exception does not apply to Mrs. Bailey's suit.

## VI.   Balancing, By Itself, Does Not Always Require Policy Judgment

The majority does not focus on the nature of the considerations that the Corps took into account when deciding when to replace the missing warning signs, but rather on the fact that the Corps had to balance competing considerations. All balancing requires policy judgment, according to the majority. *See* Maj. Op. at 16609 ("[S]o long as a decision involves even two competing interests, it is 'susceptible' to policy analysis and is thus protected by the discretionary function exception."); Maj. Op. at 16610 ("Where the government is forced,

as it was here, to balance competing concerns, immunity shields the decision.").

*All* decisions require balancing. *Every* action has both costs and benefits. There are *always* trade-offs. When the government acts to achieve some benefit, that action comes with a cost; the government consumes resources and creates risks by acting, and it forgoes opportunities to use those resources in some other fashion to obtain a different benefit. *See O'Toole*, 295 F.3d at 1037 ("Every slip and fall, every failure to warn, every inspection and maintenance decision can be couched in terms of policy choices based on allocation of limited resources"). If the discretionary function exception applied to every decision that required the government to balance "even two competing interests," Maj. Op. at 16609, then the discretionary function exception swallows the FTCA whole.

The Army had to weigh the safety of those living in military housing against the need to conserve its limited resources when it decided whether to remove snow from resident parking lots at Fort Wainwright. *See Bolt*, 509 F.3d at 1034. The United States Bureau of Reclamation had to balance safety against efficiency when it decided whether to excavate unsuitable materials from underneath the embankments of the Kennewick canal. *See Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1030-32 (9th Cir. 1989). When deciding whether to eradicate toxic mold at a commissary, the Navy had to weigh the time and money it would take against the health benefits for its employees. *See Whisnant*, 400 F.3d at 1184. The National Park Service had to balance added convenience to park visitors against risks to their safety when it decided to increase the speed limit on a park road. *See Soldano*, 453 F.3d at 1151 (9th Cir. 2006). Despite the competing considerations that underlay each of these decisions, the discretionary function exception was held not to apply.

It is not enough that the Corps had to balance competing considerations when deciding when to replace the missing

16622            BAILEY v. UNITED STATES

Daguerre Point Dam signs. We must look at the substance of those considerations, and decide whether those considerations were related to "social, economic, or political policy." *Varig*, 467 U.S. at 814. The Corps decision was motivated by safety concerns, and safety considerations are not policy considerations. I would hold that the district court erred in dismissing this suit and remand for the suit to proceed.